FILED
2015 Apr-08  PM 12:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **JOHN HOLLIS NEYMAN, on behalf of himself and on behalf of others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. _____** |
| **v.** | ) ) | |
| **CHEROKEE ELECTRIC COOPERATIVE,** | ) ) ) | |
| **Defendant.** | ) | |

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1442 and 1446, Cherokee Electric Cooperative ("Defendant"), by and through counsel, gives notice of the removal of this action from the Circuit Court of Cherokee County, Alabama to this Court. In support of removal, Defendant states the following:

1.     Plaintiff John Hollis Neyman commenced this action on behalf of himself and others similarly situated on March 3, 2015 by filing a Class Action Complaint ("Complaint") in the Circuit Court of Cherokee County, Alabama. Plaintiff's Complaint alleges Defendant, an Alabama electric distribution cooperative organized under Ala. Code § 37-6-1 *et seq.*, has violated Alabama law by failing to distribute its excess revenues as "Patronage Capital" or provide rate reductions pursuant to Ala. Code § 37-6-20. Based on these allegations, Plaintiff's Complaint asserts claims for: (1) Declaratory, Injunctive, and Equitable Relief; (2) Breach of Contract; and (3) Unjust Enrichment. This action is docketed as Civil Action Number 13-CV-2015-900030.00 (the "State Court Action").

2.     Plaintiff served Defendant with a summons and copy of the Complaint in the State Court Action on or about March 19, 2015.

1

13103085v1  27886-0001

3.      This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b) within thirty (30) days after service of the Summons and Complaint in the State Court Action upon Defendant.

4.      Copies of all process and pleadings filed and served on Defendant in the State Court Action are attached hereto as **Exhibit A**.

5.      A copy of the written notice required by 28 U.S.C. § 1446(d) to be directed to the Clerk of the Circuit Court of Cherokee County, Alabama is attached hereto as **Exhibit B**.  A copy of the written notice required by 28 U.S.C. § 1446(d) to be directed to counsel for Plaintiff is attached hereto as **Exhibit C**.  Defendant will file and serve these notices upon Plaintiff's counsel after the filing of this Notice of Removal.

6.      In relevant part, 28 U.S.C. § 1442 provides:

(a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

7.      To remove an action under 28 U.S.C. § 1442(a)(1), a defendant must show that: (1) it is a "person" within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the plaintiff's claim and the conduct performed under the color of a federal office. *Alfa Mut. Ins. Co. v. Nicholson*, No. 1:13-CV-322-MEF, 2014 WL 903126, at *3 (M.D. Ala. Mar. 7, 2014); *see Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1332 (N.D. Ala. 2010) (Order of Davis, Mag. J.).

2

13103085v1 27886-0001

8.     This action is removable under 28 U.S.C. § 1442(a)(1) because Defendant can show that: (1) it is a "person" within the meaning of the statute; (2) Plaintiff's claims are based upon Defendant's conduct acting under the direction of a federal officer; (3) Defendant possesses a colorable federal defense to Plaintiff's claims; and (4) there is a causal nexus between Plaintiff's claims and the conduct performed under the color of a federal office.

9.     A corporation, like Defendant, is a "person" within the meaning of 28 U.S.C. § 1442(a)(1). *See Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010) (explaining that plain language of § 1442 does not exclude corporations and deeming interpretation of "person" to include corporations as being consistent with the statutory scheme); *Isaccson v. Dow Chem. Co.*, 517 F.3d 129, 136 (2d Cir. 2008) (holding that the term "person" in § 1442(a)(1) includes corporate persons).

10.     Defendant was also "acting under" the direction of a federal agency by selling electricity produced by the Tennessee Valley Authority ("TVA") pursuant to contractual, regulatory, and statutory restrictions imposed by TVA.  TVA is a federal agency created and existing by virtue of the Tennessee Valley Authority Act of 1933 (the "TVA Act").  16 U.S.C. § 831 *et seq.* In relevant part, the TVA Act provides that:

> The [TVA] Board [of Directors] is hereby empowered and authorized to sell the surplus power not used in its operations, and for operation of locks and other works generated by it, to States, counties, municipalities, corporations, partnerships, or individuals, according to the policies hereinafter set forth; and to carry out said authority, the Board is authorized to enter into contracts for such sale for a term not exceeding twenty years, and in the sale of such current by the Board it shall give preference to States, counties, municipalities and cooperative organizations of citizens or farmers, not organized or doing business for profit, but primarily for the purpose of supplying electricity to its own citizens or members; . . . ***Provided further,* That the Board is authorized to include in any contract for the sale of power such terms and conditions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purposes of this Act, and in case the purchaser shall fail to comply with any such terms and**

13103085v1 27886-0001

conditions, or violate any such rules and regulations, said contract may provide that it shall be voidable at the election of the Board; . . . *And provided further*, That the terms "States," "counties," and "municipalities" as used in this Act shall be construed to include the public agencies of any of them unless the context requires a different construction.

18 U.S.C. § 831i (emphasis added).  Pursuant to the authority granted under the TVA Act, TVA

entered into a contract with Defendant (the "TVA Contract") under which Defendant sells

electricity produced by TVA.   A copy of relevant portions of the TVA Contract is attached

hereto as **Exhibit D**.    Section 1 of Defendant's contract with TVA states:

It is hereby recognized and declared that, pursuant to the obligations imposed by the TVA Act, [Defendant's] operation of an electric system and TVA's wholesale service thereto are for the benefit of the consumers of electricity.  Toward that end, [Defendant] agrees that the electric system shall be operated on a nonprofit basis, that electric system funds and accounts shall not be mingled with other funds or accounts of [Defendant], and that resale rates and charges shall be applied which will provide revenues which can reasonably be expected to be at least equal to, and not substantially greater than, the sum required for the items listed in subsection (a) of section 6 hereof.  In accordance with these principles, which are mutually recognized as of the essence of this contract, [Defendant] agrees that the electric system shall be operated and **the system's financial accounts and affairs shall be maintained in full and strict accordance with the provisions of this contract.**

(Exh. D) (emphasis added).   Section 5 of the TVA Contract specifies how resale rates that

Defendant charges to consumers are established.

5.      Resale Rates.  In distributing electric energy in the area served by [Defendant], the parties agree as follows:

(a) [Defendant] agrees that the power purchased hereunder shall be sold and distributed to the ultimate consumer without discrimination among consumers of the same class, and that no discriminatory rate, rebate, or other special concession will be made or given to any consumer, directly or indirectly.

(b) **[Defendant] agrees to serve consumers, including all municipal and governmental customers and departments, at and in accordance with the rates, charges, and provisions set forth for the several classes thereof in Schedules RS-4, GS-4, and LS of said Schedule of Rates and Charges, and not to depart therefrom except as the parties hereto may agree upon surcharges, special minimum bills, or additional resale schedules for**

4

**special classes of consumers or special uses of electric energy, and except as provided in subsection (c) next following**.

. . .

(c)  If the rates and charges provided for in said resale schedules do not produce revenues sufficient to provide for the operation and maintenance of the electric system on a self-supporting and financially sound basis, including requirements for interest and principal payments on indebtedness incurred or assumed by [Defendant] for the acquisition, extension, or improvement of the electric system (hereinafter called "System Indebtedness"), the parties shall agree upon, and [Defendant] shall put into effect promptly, such changes in rates and charges as will provide the increased revenues necessary to place the system upon a self-supporting and financially sound basis.  If the rates and changes in effect at any time provide revenues that are more than sufficient for such purposes, as more particularly described in section 6 hereof, the parties shall agree upon a reduction in said rates and charges, and [Defendant] shall promptly put such reduced rates and charges into effect.

(Exh. D) (emphasis added).  With regard to excess revenues realized by Defendant, Section 6 of

the TVA Contract provides:

(a)      [Defendant] agrees to use the gross revenues from electric operations for the following purposes:

(1) Current electric system operating expenses, including salaries, wages, cost of materials and supplies, taxes, power at wholesale, and insurance;

(2) Current payments of interest on System Indebtedness, and the payment of principal amounts, including sinking fund payments, when due; and

(3) From any remaining revenues, reasonable reserves for renewals, replacements, and contingencies; and cash working capital adequate to cover operating expenses for a reasonable number of weeks.

(b)      All revenues remaining over and above the requirements described in subsection (a) of this section shall be considered surplus revenues and may be used for new electric system construction or the retirement of System Indebtedness prior to maturity; provided, however, that resale rates and charges shall be reduced from time to time to the lowest practicable levels considering such factors as future circumstances affecting the probable level of earnings, the need or desirability of financing a reasonable share new construction from such surplus revenues, and fluctuations in debt service requirements.

13103085v1 27886-0001

(Exh. D). Section 8 of the TVA Contract also adopts and implements the "Schedule of Terms and Conditions" attached to the TVA Contract. (Exh. D). Regarding the adjustment and change of wholesale and resale electricity rates, the Schedule of Terms and Conditions provides:

6.  Adjustment and Change of Wholesale Rate and Resale Rates.  The wholesale rate and resale rates provided in sections 4 and 5 of the contract shall be subject to adjustment and change from time to time in accordance with this section in order to assure TVA's ability to continue to supply the power requirements of [Defendant] and TVA's other customers on a financially sound basis with due regard for the primary objectives of the TVA Act, including the objective that power shall be sold at rates as low as feasible, and to assure [Defendant's] ability to continue to operate on a financially sound basis.

. . .

Adjustment. TVA will review with [Defendant] or its representative, at least 30 days prior to the first day of each of the months of October, January, April, or July pertinent data concerning the current and anticipated conditions and costs affecting TVA's operations and the adequacy of its revenues from both wholesale and other power customers to meet the requirements of the TVA Act and the tests and provisions of its bond resolutions as provided in the second paragraph of this section. At least fifteen days prior to the first day of each of the aforesaid months, TVA will determine what adjustments, if any, are required in the demand and energy charges provided for in the then effective Schedule of Rates and Charges to assure (a) revenues to TVA adequate to meet the requirements of the TVA Act and the tests and provisions of its bond resolutions as provided in the second paragraph of this section and (b) revenues to [Defendant] adequate to compensate for changes, if any, in the cost of power to [Defendant] resulting from adjustments to Wholesale Power Rate – Schedule WS made under the provisions of this section. Such adjustments as TVA determines are required shall be incorporated by TVA in Adjustment Addendums to Wholesale Power Rate – Schedule WS and to the resale schedules of the Schedule of Rates and Charges, which Adjustment Addendums shall be promptly published by TVA by mailing the same to [Defendant] by registered mail and shall be applicable to bills rendered from meter readings taken for TVA and [Defendant] billing cycles scheduled to begin on or after the effective date of said Adjustment Addendum; provided that any adjustment determined by TVA to be necessary as hereinbefore provided shall not be conditioned upon or be postponed pending the review provided for in the first sentence of this paragraph or the completion of such review. **[Defendant] shall pay for power and energy in accordance with Wholesale Power Rate – Schedule WS of the Schedule of Rates and Charges as so adjusted from time to time by any such Adjustment Addendums published by TVA as above provided, and shall adjust the charges in the resale schedules of the Schedule of Rates and Charges applicable to its customers in accordance with such Adjustment Addendums and the provisions of such rate schedules.**

13103085v1 27886-0001

. . .

(Exh. D) (emphasis added). Pursuant to the TVA Contract and the Schedule of Terms and Conditions attached thereto, Defendant's resale rates for electricity produced by TVA and revenues generated therefrom are subject to the direct and detailed control of TVA. Accordingly, Defendant was "acting under" the direction of a federal agency by selling electricity produced by TVA to Plaintiff pursuant to contractual specifications and requirements imposed by TVA regarding resale rates and excess revenues.

11.     Additionally, Plaintiff's claims are preempted under the TVA Act; thus, Defendant possesses a colorable federal defense to Plaintiff's claims. As referenced above, TVA's Board of Directors is "authorized to include in any contract for the sale of power such terms and conditions, including resale rate schedules, and to provide for such rules and regulations as in its judgment may be necessary or desirable for carrying out the purposes of [the TVA] Act." The setting of resale rate schedules and ability to impose restrictions on use of excess revenues generated by Defendant, limited only by the provision that they not violate the TVA Act, is a broad grant of discretion to the TVA Board to set power rates at the consumer level and dictate how excess revenues generated by Defendant are used. Under the supremacy clause contained in Article IV of the United States Constitution, the congressionally granted rate making authority and authority to restrict the use of excess revenues is not subject to modification or interference by state legislation. Accordingly, in the absence of a clear violation of the purposes of the TVA Act, the matter of rate setting and Defendant's use of excess revenues generated by its sale of electricity produced by TVA under the TVA Act are not subject to judicial review. *See e.g.*, *Mobil Oil Corp. v. TVA*, 387 F. Supp. 498 (N.D. Ala. 1974); *Ferguson v. Electric Power Board of Chattanooga, TN*, 378 F. Supp. 787 (E.D. Tenn. 1974). Because Defendant's resale rates and its use of excess revenues are subject to the direct and

7

detailed control of TVA vis-à-vis its rules and regulations imposed pursuant to TVA's authority under the TVA Act, Plaintiff's claims premised upon Defendant's failure to distribute excess revenue in the form of "Patronage Capital" or provide rate reductions pursuant to Ala. Code § 37-6-20 are not subject to judicial review and fail as a matter of law under the TVA Act. Accordingly, Defendant has a colorable federal defense to Plaintiff's claims.

12.     Finally, there is a causal nexus between Plaintiff's claims and Defendant's sale of electricity produced by TVA pursuant to contractual specifications and requirements imposed by TVA. Here, Plaintiff asserts that Defendant has violated Alabama law by failing to distribute excess revenues in the form of "Patronage Capital" or provide resale rate reductions. Because Defendant's resale rates and use of excess revenues are subject to rules and regulations established by TVA under the TVA Act, there is necessarily causal nexus between Defendant's sale of electricity produced by TVA and Plaintiff's claims that Defendant is required to distribute excess revenues in the form of "Patronage Capital" or provide resale rate reductions.

13.     Accordingly, for the reasons stated above, Defendant is entitled to remove the State Court Action to this Court pursuant to 28 U.S.C. § 1442.

As a result, Defendant hereby removes the State Court Action from the Circuit Court of Cherokee County, Alabama, to this Court, and respectfully requests that this Court assume complete jurisdiction over all claims to the exclusion of further proceedings in the State Court.

Respectfully submitted this 8th day of April, 2015

13103085v1 27886-0001

**The Coggin Firm, LLC**

By: s/ John D. Coggin
      John D. Coggin (ASB-1519-N77J)
      104 Northwood Drive
      Professional Building-Suite D
      Centre, Alabama  35960
      Telephone: (256) 927-9090

      *Attorneys for Defendant Cherokee Electric*
      *Cooperative*

9

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing pleading was served by depositing same in the United States Mail, with sufficient postage affixed thereon to ensure delivery to:

> Will J. Parks, III (PAR091)
> 107 East Laurel Street
> Scottsboro, AL 35768
> wparks@scottsborolawyer.net
>
> Oscar M. Price, IV (PR1083)
> Nicholas W. Armstrong (ARM025)
> Price Armstrong, LLC
> 2421 2nd Avenue North, Suite 1
> Birmingham, AL 35203
> Oscar@pricearmstrong.com
> nick@pricearmstrong.com
>
> Luke Montgomery (MON068)
> J. Bradley Ponder (PON009)
> Montgomery Ponder, LLC
> 2421 2nd Avenue North
> Birmingham, AL 35203
> luke@montgomeryponder.com
> brad@montgomeryponder.com

Dated this 8th day of April, 2015.

**The Coggin Firm, LLC**

By: s/ John D. Coggin
    John D. Coggin (ASB-1519-N77J)

10